**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF MICHIGAN**

SHEILA LEWIS, Personal Representative
of the Estate of Natasha Roark,

Plaintiff,

v.

Case No.
Hon.
Mag. Judge

HEIDI WASHINGTON, individually, and in her official capacity WARDEN JEREMY HOWARD, individually, and in his official capacity, UNIDENTIFIED DEPUTY WARDEN, individually and in his official capacity, UNKNOWN OFFICER #1, UNKNON OFFICER #2, and UNKNOWN OFFICER #3 and MEDICATION DISPENSOR #1.

Defendants.

---

THE MICHIGAN LAW FIRM, PC
RACINE M. MILLER (P72612)
Attorneys for Plaintiff
135 N. Old Woodward Ave, Ste 270
Birmingham, MI 48009
Phone: (844)464-3476
Fax: (248)237-3690
racine@themichiganlawfirm.com

---

**PLAITNIFF'S COMPLAINT AND JURY DEMAND**

NOW COMES the Plaintiff, SHEILA LEWIS, Personal Representative of the Estate of Natasha Roark, deceased, by and through counsel, The Michigan Law Firm, PC, by Racine M. Miller, and in support of her Complaint for damages and Demand for Jury states as follows:

**JURISDICTION, VENUE, AND PARITES**

1. This is an action seeking to redress the wrongs committed in violation of the constitutional rights of Natasha Roark, against Michigan Heidi Washington, director of the MDOC, Women's Huron Valley Correctional Facility ("WHV") Warden Jeremy Howard, and various officers/personnel employed at the WHV, pursuant to 42 U.S.C. § 1983.
2. This action is brought pursuant to federal statute at 42 U.S.C. § 1981, 1983, 1985 and 1988, for deprivation of rights secured by the federal Constitution at the IV, VIII and XIV Amendments. Jurisdiction is founded upon 28 U.S.C. § 1331, 1343(1), (3) and (4). Plaintiff further invokes the pendant jurisdiction of this Court to adjudicate state law claims.
3. Plaintiff Sheila Lewis is a resident of the State of Florida, is the mother of the deceased, is the duly appointed Personal Representative of the Estate of Natasha Roark, and brings this action under Michigan's Wrongful Death Statute. M.C.L. 600.2922.
4. Plaintiff's decedent, Natasha Roark, (hereinafter referred to as "Roark" or "decedent") was incarcerated at the Women's Huron Valley Correctional Facility during the time of the events giving rise to this Complaint; Roark is entitled to all rights, privileges, and immunities accorded to all citizens of the United States.

5. The Women's Huron Valley Correctional Facility is located in Pittsfield Township, Michigan.
6. The amount in controversy exceeds Seventy-Five Thousand ($75,000) Dollars.
7. All events, transactions, or occurrences pertinent hereto, transpired within the County of Washtenaw, State of Michigan.
8. Defendant, Warden Jeremy Howard who was acting under color of law, was at all relevant times, employed by the MDOC as the Warden of WHV and is, upon information and belief, responsible for the operation of WHV, and the supervision, training, discipline, and other functions of WHV's employees, staff and/or agents, and ensuring that Defendants enforced and abided by the policies and regulations of the MDOC, and the State of Michigan, and the United States. In addition, Warden Jeremy Howard's duties and responsibilities include the development and implementation of policies and procedures for the operation and management of WHV and its employees. He is further responsible for the care, custody and protection of individuals including Roark.
9. At all times relevant Defendant Heidi Washington, who was acting under color of law, was the director of the MDOC, acting in her official and policy making capacity and acting under color of law. She

is responsible for the development and implementation of policies and procedures for the operation and management of MDOC facilities and its employees. It is further responsible for the care, custody and protection of individuals including Roark.

10. Defendant, UNIDENTIFIED DEPUTY WARDEN was, at all relevant times, who was acting under color of law, employed by the MDOC as the Warden of WHV and is, upon information and belief, responsible for the operation of WHV, and the supervision, training, discipline, and other functions of WHV's employees, staff and/or agents, and ensuring that Defendants enforced and abided by the policies and regulations of the MDOC, and the State of Michigan, and the United States. In addition, UNIDENTIFIED DEPUTY WARDEN's duties and responsibilities include the development and implementation of policies and procedures for the operation and management of WHV and its employees. He is further responsible for the care, custody and protection of individuals including Roark.

## GENERAL ALLEGAIONS

11. On May 26, 2009, Roark was found by the Washtenaw County Circuit Court appointed agency to have not been in compliance with a previous order for mental health treatment, and was found to not be

taking her medications, that she was "[d]elusional, paranoid, psychotic."

12. On May 27, 2009, the Washtenaw County Circuit Court ordered her to be hospitalized and then participate in a community mental health services program. The Court further ordered her to "[t]ake prescribed medications; comply with treatment plans; Attend ATO Appointments."
13. The Washtenaw County Circuit Court issued at least one more order on July 22, 2009, for additional metal health treatment and that if she refused "to comply with a psychiatrist's order to return to the hospital, a peace officer shall take the individual into protective custody."
14. Dr. Daniel Healy, MD certified to the Washtenaw County Circuit Court that Roark was "unable to care for herself," outlined repeated hospitalizations going back to 2003, and confirmed that "she allegedly made threats of harm [to] herself."
15. Roark had a history of judicial interactions regarding formal orders relating to her mental health status and need for medications, including, but not limited to a 20th Circuit for Collier County, Florida, Case number 10-3532-mm.

16. On December 23, 2012, a formal affidavit of health care proxy was executed, so that Sheila Lewis, after a mental health episode, following the birth of Roark's third child.

17. On April 4 2017, via Court Order, Judge Miriam A. Cavanaugh of the Livingston County Circuit Court found clear and convincing evidence of "mental illness" and that Roark was "partially without the capacity to care for ...herself."

18. Accordingly, the Livingston County Circuit Court appointed Sheila Lewis as Roark's guardian.

19. MDOC knew and/or should have known of the elevated risk of suicide for Roark.

20. Dr. Vincent Pernell, MD, on an MDOC report, noted an "Intermediate Risk of self-harm/suicide" on or about October 3, 2017.

21. Dr. Pernell, in his October 3, 2017 report acknowledges "at least four inpatient psychiatric hospitalizations including 2 admissions to DMC in 2015," "an admission approximately 10 years ago in Florida at Rockford Memorial and another admission at Chicago Reed," as well as "a documented involuntary admission for psychiatric care in Oakland County in 2009 to DMC."

22. Dr. Pernell's October 3, 2017 MDOC report, further acknowledges a plethora of mental health concerns, such as "Dipolar

Disorder, Borderline Personality Disorder, and Mood Disorder," as well as the need for medications such as "Zoloft, Prozac, Depakote, Trazodone, Cogentin, and Prolixin LAI."

23. Roark was indicated as having a "moderate" suicide risk level when examined by Dr. Pernell on November 1, 2018.

24. On November 16, 2018, Quinn LaFleur PA indicated "[u]nable to complete telemed scheduled for today as patient is in seg, non-bond status and suicide watch. Custody unable to transport her to healthcare do to this."

25. A November 14, 2018 report from Sandra J. Taylor, MA, LLP indicated "[o]ngoing suicide risk assessment while on 15 minute checks with safety precautions."

26. In her November 14, 2018 Mental Health Management Plan report, Sandra J. Taylor, MA, LLP states Roark "is at INTERMEDIATE RISK of suicide or self-injury," and that she "[m]ay shower at the discretion of the custody supervisor," among other restrictions.

27. By December 3, 2018, Jandra J. Taylor, MA, LLP indicated an "INTERMEDIATE RISK of suicide or self injury."

28. On December 18, 2020, a referral was made for additional mental health evaluation and treatment because "Roark 360786

reported to this officer that she was seeing and hearing things that werent [sic] there."

29. Roark's records are replete with mentions of and healthcare providers' concerns over her self-harming and being at an increased suicide risk.

30. As of January 6, 2021 MDOC reported that she was still being monitored for suicide concerns.

31. Her restrictions at that time included the following:

**Restrictions**

1. Place in Observation Cell.
2. Dress in tear-resistant gown only. May have mattress and tear-resistant blanket
3. Provide finger foods only. If bagged, the bag shall not be given to the prisoner
4. Leave on light to aid in visual observation
5. Per 04.06.115 Personal property shall be secured or stored, except ring or wedding band set, dentures, and prostheses. Prisoner will be allowed certain items as determined medically necessary by health care staff.

COMMENT: If the prisoner uses or attempts to use any item identified above to impede observation or to attempt to engage in self-injurious behavior, staff immediately respond and remove items(s) and contact the Duty Administrative Officer to determine if the item(s) should continue to be withheld.

32. Roark was required to have a "Continuous 1:1" "Frequency of Observation."

33. On January 11, 2021, unknown Lieutenant confirmed Roark should have 15 minute safety checks and must have an evaluation QMHP/QHP "every business day."

34. On January 12, 2021, MDOC had a CHJ-317 report authored by Arun Kulkerni, MD, a psychiatrist.

35. Dr. Kulkerni noted that "[s]he continues to hear voices, feeling depressed, talks of cutting self, has been in and out of seg – talks of her husband faking his death, feels someone is harvesting her eggs to sell them etc," and he further indicated that she "continues to require mental health services" so that she does not hurt herself.

36. Dr. Kulkerni further noted that "psychotropic medications" and "individual supportive psychotherapy" were necessary.

37. On April 8, 2021, Roark had her final appointment with Dr. Kulkerni

38. Shortly before Roark's passing, Defendants allowed her to deviate from her Court-ordered and medically necessary treatment plan, as she did not participate in a number of critical medical appointments, including but not limited to:

a. Roark was permitted to miss a medical review on June 8, 2021.
b. Roark was permitted to miss a June 14, 2021 group therapy ASAT session and was marked as unexcused.
c. On July 26, 2021, Defendants permitted Roark to miss her medical appointment, shortly before she tragically took her own life.

39. MDOC video analysis confirms that Roark exited cell GA-25 "with bed sheet" on August 11, 2021 at 11:38 a.m. and makes another trip to the cell with the bedsheet.

40. That same day:

a. at 11:39 a.m., Roark asked Unknown Officer #1 to unlock a handicap restroom door;

b. at 11:40 a.m., Roark entered the restroom and shut the door behind her;

c. at 11:56 a.m. Unknown Officer #2, enters the unit and relives Unknown Officer #1;

d. at 12:42 p.m., Unknown Officer #2 opens the restroom door;

e. at 12:43 p.m., Unknown Officer #2 and Unknown Person #1 observe Roark "with a bedsheet tied around her neck and the other end tied around the shower rod, as depicted below.



41. Natasha Roark was found unresponsive when she was cut down from the bedsheet tied around the shower rod.

42. According to Unknown EMT #1, "due to the amount of time [Roark] was hanging and unconscious" their protocol did not allow the EMTs to render any medical treatment.

43. Natasha Roark was pronounced dead on August 11, 2021 at 1:06 p.m. by the EMTs.

44. In the post incident review – WHV 039-21 – the Warden even indicated that "[s]ome prisoners witness [sic] some usual behavior with" Roark prior to hear death.

45. Further, the WHV did not properly document the scene in accordance with their policies for videotaping incidents.

46. The post incident review also conceded that WHV employees needed to receive better training with the "hand-held video cameras that all staff were" allegedly "trained on."

47. Instead of video, WHV only took several still photographs "were accidently taken" of the incident scene.

48. A postmortem examination was performed on Roark.

49. The autopsy was performed by the Medical Examiner, Jeffrey Jentzen, M.D., Ph.D.

50. It was noted in the autopsy report that "[p]er the investigative report, Natasha Roark was an inmate at the Huron Valley Women's Correctional Facility. She was currently placed in the unit that she was in as a 'residential treatment prisoner' for mental health."

51. The toxicology results only indicate finding Naloxone (Narcan) in Roark's iliac blood.

52. This exam revealed that the medications she was prescribed and she was supposed to be taking for her mental health diagnoses, including but not limited to Haloperidol, Sertraline HCL, Zoloft, Vistaril, and Reno Caps, were not found.

53. This is because Roark was not taking her Court-ordered and physician prescribed medications before she was permitted to commit this act of self-harm while in Defendants' custody and care.

54. On or about June 15, 2021, Roark reported to her psychiatrist that she had obtained prescription pain medication such as Vicodin from another inmate, disclosed a range of other substance abuse issues she had not previously mentioned and he was unaware of, and she also indicated her interest in seeking more treatment for these issues while incarcerated.

55. Despite this June 15, 2021 meeting, she never made it to the additional treatment she sought before she passed.

56. MEDICATION DISPENSOR #1, who was acting under color of law, was not adequately supervising the administration of and/or ingestion of the medications that Roark was supposed to be taking, contrary to MDOC policies that existed and/or should exist.

57. UNIDENTIFIED OFFICER #1, who was acting under color of law, did not adequately warn UNIDENTIFIED OFFICER #2 and/or other appropriate personnel that Roark was in the bathroom and/or that she was in the bathroom with a bedsheet.

58. UNIDENTIFIED OFFICER #2, who was acting under color of law, did not timely locate and supervise Roark, while she was planning to and did actually hang herself in the WHV bathroom, contrary to MDOC policies that existed and/or should exist.

59. UNIDENTIFIED OFFICER #3, who was acting under color of law, did not observe on the security monitors and/or failed to report to other WHV personnel, that Roark, an inmate with a well-documented case of mental health disorders, as discussed herein, had taken a bedsheet to the bathroom and/or was otherwise acting suspicious, contrary to MDOC policies that existed and/or should exist.

60. Further, Defendants knew or should have known that persons have previously been injured and/or killed in a similar manner as Roark.

61. Even since Roark's tragic death, similar injuries and/or deaths at WHV have occurred.

## COUNT I - DEFENDANTS MDOC & HEIDI WASHINGTON VIOLATION OF FEDERAL RIGHTS- MONELL LIABILITY

62. Plaintiff hereby incorporates by reference the preceding paragraphs as though set forth fully herein.

63. Defendants also owed Roark the following duties and obligations:

a. to provide safe housing;

b. to conduct reasonable and adequate cell checks;

c. to appropriately determine the necessary frequency of observation;

d. the duty to implement and monitor an adequate policy and training program for all officers and deputies working at WHV so that they would be capable of making decisions about the need for monitoring and medical care which arose when there was not a health care professional present;
e. To use due care and caution;
f. To adequately and properly create and promulgate guidelines and policies that comply with the requirements of 42 U.S.C. § 1983 regarding the incarceration of prisoners and the supervision of prisoners, especially those who are mentally, emotionally, and physically unstable and those who are diagnosed as having psychiatric or psychological problems;
g. To adequately and properly create and promulgate guidelines and policies that comply with the requirements of 42 U.S.C. § 1983 regarding the incarceration of prisoners who have threatened self-injury or suicide to ensure that MDOC staff personnel can immediately and appropriately respond and take action when a prisoner is in distress and has threatened self-injury or suicide;
h. To adequately and properly train and supervise correction officers and employees of the WHV under their supervision on

the proper method of supervising prisoners and providing for their medical needs and on effectively controlling prisoners who have or are suspected to have psychological or psychiatric problems;

i. To avoid hiring or selecting individuals who it knows or should know are incapable of performing their responsibilities or who are likely to misuse or abuse the power conferred on them as employees of the WHV.

64. These Defendants failed in these above duties to adequately train detention facility/jail personnel, and historically have had a policy, custom, and practice of failing to implement an adequate camera monitoring policy and training program to properly train WHV detention personnel.

65. The events leading up to the subject incident which resulted in Roark's death, was caught on MDOC video camera, and Defendants should have instituted policies and/or enforced policies which would have alerted WHV personnel to respond to an inmate making multiple trips to a bathroom with bedsheets, especially, one who has a long history of mental health issues, as set forth herein.

66. These Defendants adopted, ratified, and/or implemented the policies, practices and procedures which denied Plaintiff's decedent

the right to safe housing and did so with deliberate indifference to Roark's serious medical needs, thereby violating Roark's constitutional rights.

67. The acts and omissions of the Defendants taken pursuant to the de facto policies, practices and procedures, adopted, ratified, and/or implemented by Defendants, impermissibly condoned and allowed for the denial of proper and secure housing, monitoring, medical care and treatment to residents of WHV, such as Roark, which amounts to deliberate indifference in the denial of such detainees' civil rights as are guaranteed by the Constitution of the United States.

68. The aforesaid acts and omissions of Defendants were all committed under color of law and under color of their official authority.

69. Defendants breached these duties via their policies, procedures, regulations, customs, and/or lack of training and thus exhibited a reckless indifference toward its prisoners, and Roark specifically, in the following ways, including but not limited to:

a. Defendants' failure to staff the jail with competent medical personnel so that a mental health professional;

b. Defendants' failure to monitor their correctional officers and medical personnel to ensure that they adequately monitor and supervise prisoners who have serious medical needs;

c. Defendants' failure to have proper policies and procedures, and training to deal with prisoners in the observation cell and ensure that the policies and/or procedures are followed, which include serial examinations by competent and licensed medical and mental health personnel like RNs, Psychologists, and/or Doctors as well as its failure to ensure the correctional officers conduct timely and adequate rounds and record their observations of the prisoners every 15 minutes as required by their own policies and/or procedures;

d. Defendants' failure to require that an RN, Doctor, or Mental Health Professional perform a full and complete examination of a prison held in a medical observation cell, at least once per day;

e. Defendants' failure to have proper policies and procedures in place to deal with jail overcrowding in the high observation units of the facility;

f. Defendants' failure to have proper policies and procedures, and training to deal with prisoners who have threatened self-injury or suicide to ensure that MDOC staff personnel can

immediately and appropriately respond and take action when a prisoner is in distress and has threatened self-injury or suicide;

g. Defendants' failure to fully investigate and discipline its correctional officers and/or medical/mental health personnel who do not abide by its policies and procedures relative to providing medical care for serious conditions;

h. All other breaches learned through the course of discovery.

70. Defendants trained their officials and/or employees and agents in such a reckless and grossly negligent manner, that it was inevitable that the officials would place a suicidal prisoner in a place where she would not be supervised when it was obvious that such a prisoner needed constant supervision. Notwithstanding Roark's contemplation of suicide and request for a suicide prevention vest, Defendants repeated and acquiesced in the continued practice of not placing potentially suicidal prisoners, such as Roark, under close supervision and acquiesced in the repeated and continued practice of not adequately treating suicidal prisoners in obvious need of treatment.

71. The failure of Defendants to provide training and supervision regarding the prevention of suicides amounts to deliberate indifference to the safety and lives of the prisoners of the WHV and particularly Roark.

72. Defendants knew or in the exercise of reasonable care should have known that individual prison officials had engaged in misconduct and other violations of the constitutional rights of prisoners at the WHV, more specifically of Roark.

73. Despite knowledge of its aforesaid pattern and practice, Defendants failed to properly investigate the improper practices and to supervise and train the prison officials at the MDOC.

74. Defendants developed a "hands-off" policy or custom with regard to the omissions of individual prison officials which encouraged the individual officials to believe they could violate the constitutional rights of Roark with the explicit or tacit approval of the Defendants herein.

75. As a direct and proximate result of the above-cited violations of Roark's civil rights by Defendants, Roark died and thus her Estate, has and will continue to suffer damages in the future, including, but not limited to:

   a. Reasonable funeral and burial expenses;
   b. Reasonable compensation for the pain and suffering undergone by Roark while she was conscious during the time between her first psychiatric symptoms and her death;
   c. Loss of comfort, society, and companionship;

d. Compensatory and punitive damages; and

e. Any and all other damages otherwise recoverable under U.S.C. Section 1983 and Section 1988.

## COUNT II – FEDERAL UNITED STATES CONSTITUTIONAL VIOLATIONS BY INDIVIDUAL DEFENDANTS

76. Plaintiff hereby incorporates by reference the preceding paragraphs as though set forth fully herein.

77. All the Defendants, at all times herein, owed Plaintiff's decedent the duty of protecting his federal constitutional rights, including the following guaranteed rights:

    a. The right to be securely housing while in custody of Defendants;
    b. The right to be free from bodily harm and injury caused unjustifiably while in custody of Defendants; and
    c. The right not to be subjected to cruel and unusual punishment.

78. The individual Defendants owed a duty to Plaintiff's decedent as a resident detainee of the WHV to provide her with appropriate and adequate housing along with reasonable medical care upon being told of her medical complaints, including but not limited to:

    a. proper monitoring of Roark's health and physical condition;

b. regularly examining Plaintiff's decedent for signs and symptoms of medical illness or disease after he had made complaints regarding such;

c. detecting signs and symptoms of Roark's serious health condition and suicidal ideation and providing timely intervention of the same.

79. Despite the Defendants' knowledge of the ongoing suffering of the Plaintiff, they refused to take reasonable steps to provide for Roark's safety and provide medical attention, at variance with constitutional standards as follows:

a. failing to take heed of the seriousness of Roark's decades-long history of documented risks of self-harm and other related conditions when they knew or should have known that the Plaintiff's decedent was suffering from a serious medical condition, in this case, mental disability and suicidal ideation, which can be potentially fatal if the patient is not properly attended to;

b. failing to prevent Roark from taking bedsheets to the bathroom where she was not monitored so she could harm herself;

c. failing to monitor Roark while she was in a closed room, alone, with bedsheets she took from her bed or other such similar location,

d. failing to have Plaintiff's decedent regularly evaluated at the facility by a nurse, doctor and/or emergency medical service technician when she was in need of immediate medical attention and supervision.

e. failing to transport Plaintiff's decedent to a medical facility within a reasonable time of his complaints which would have successfully treated his condition without resulting in his death;

f. failing to monitor and communicate the status of Roark's condition when she was suffering and in the custody of the Defendants;

## DAMAGES

WHEREFORE, Plaintiff SHEILA LEWIS, Personal Representative of the Estate of Natasha Roark, respectfully requests that this Honorable Court enter Judgment in her favor against Defendants, jointly and severally, for an amount in excess of $75,000, exclusive of costs, interest, attorney fees, punitive damages, and any such further relief as deemed equitable and appropriate.

Respectfully submitted,

THE MICHIGAN LAW FIRM, PC

/s/ Racine M. Miller
RACINE M. MILLER (P72612)
Attorneys for Plaintiff

Dated: August 9, 2024

## DEMAND FOR TRIAL BY JURY

NOW COMES Plaintiff, by and through the undersigned attorneys, and hereby demands a trial by jury of each and every matter at issue in the above-entitled cause.

Respectfully submitted,

THE MICHIGAN LAW FIRM, PC

/s/ Racine M. Miller
RACINE M. MILLER (P72612)
Attorneys for Plaintiff
135 N. Old Woodward, Ste 270
Birmingham, MI 48009
Phone: 844.464.3476
Fax: 248.237.3690
racine@themichiganlawfirm.com

Dated: August 9, 2024